IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Eighth Street Car Wash,

    Plaintiff,

vs.                                          Case No. 13-1070-JTM

City of Chanute, Kansas,

    Defendant.

MEMORANDUM AND ORDER

The plaintiff Eighth Street Car Wash has moved for a preliminary injunction, arguing that the City of Chanute, Kansas has violated its constitutional rights by limiting its hours of operation. The plaintiff argues that the City's water restrictions lack any rational basis, and that it was unfairly singled out. In light of the facts and the controlling standard of review, the court finds that an injunction should not issue.

*Facts*

Kansas is in the grip of a chronic water shortage. By July 11, 2012, 82 Kansas counties had been declared federal disaster areas due to the drought. On July 25, 2012, the Governor placed all Kansas counties under an Emergency Drought Stage Order.

On August 13, 2012, the Chanute City Commission voted to declare Stage 1 and 2 Water Watches. A Stage 1 Watch publicizes the need for voluntary conservation. A Stage 2 Watch declares a water warning exists, and that the commission "will recommend restrictions based upon Chanute's Water Conservation Program on nonessential uses during the period of the warning."

The City then issued a notice of Stage 2 Water Restrictions, to apply to "[a]ll Chanute water users, including residents, businesses, and rural water districts," to begin August 15. The notice provided for a fine of $150 to $500 for each violation of the following restrictions:

1. Lawn/Garden watering is restricted to an odd/even schedule between the hours of 9:00 p.m. and 10:00 a.m. by handheld hose or bucket only. Odd numbered addresses may water on odd numbered days of the month; even numbered addresses may water on even numbered days of the month.

2. All commercial and residential car washing is restricted to the hours between 9:00 p.m. and 10:00 a.m.

3. Golf courses are restricted to watering tee box and greens only after sunset and before sunrise. Hand watering of greens during the day may be done at temperatures over 90°. All other conditions of the courses water rights apply.

4. Customer water leaks must be repaired within 24 hours of detection.

5. Topping off of swimming pools due to evaporation is allowed between the hours of 9:00 p.m. and 10:00 a.m. until Labor Day, September 3, 2012. After Labor Day, adding water to swimming pools is prohibited.

6. Waste of water is prohibited.

The notice also provided that if sufficient water savings were not achieved, the city might implement an emergency rate structure. The restrictions were adopted to level water demand during the day, and reduce peak demand by 20% (from 2.64 to 2.11 million gallons) and weekly total consumption by 10% (from 9.45 to 8.5 million gallons). The restrictions would remain in place "until conditions in the Cottonwood/Neosho River Basin improve to the point that the Drought Declaration is lifted by the Governor."

In the three months following the resolution, the city issued 24 warnings for water violations. Almost all of the warnings were issued to residential customers, and four business, for sprinkler use. In addition, the city issued a warning to the First United Methodist Church for filling its swimming pool, and against one individual for washing his car on the wrong day. Finally, the city investigated a complaint that a local car dealer had been washing its cars, but determined that no violation occurred under the Restrictions since the water was being used out of a separate tank.

On August 27, 2012, Director of Utilities Larry Gates reported to the City Commission on drought and water conditions. A video of this meeting has been presented to the court. He stated that the City had "assembled a team of staff to look at the City's water supply, time frame left on our assurance water reserves, lake levels in our water basin, and all possible emergency water supplies." In addition, officers had met with the Kansas Water Office, the Kansas Department of Agriculture, the Kansas Department of Health and Environment, Kansas Wildlife and Parks to discuss worst case drought scenarios.

Cody Mummert, the plaintiff's owner appeared during the public comment session. He complained that his business was unfairly singled out in comparison to other users, and that his business was off 75% since the restrictions began. The Commissioners asked Gates about the progress of the conservation restrictions, and he reported that the thought the City would meet its goal of reducing peak demand by 20%, and they had also reduced daily usage by "quite a bit."

Mummert acknowledged that "bathing, drinking, and cooking is whole lot more essential than washing cars. I know that." He also stated:

> I'll be truthful. We've talked to legal, to counsel and everything. And they are also telling us the same thing, you know. You're not doing anything illegal. You're doing everything you can to salvage what's going on out here. Nobody's saying you're doing anything illegal. But our only question is, what you're doing is fair. And that's our question with it.

According to one of the Commissioners, the restrictions imposed by the City were similar, with a few minor exceptions, to those adopted by other cities in the watershed. The Commission then adopted as potential compromise, a resolution which would allow car washes to remain open from 9:00 p.m. Thursday to 8:00 p.m. Saturday. Gates would then report back on how this affected water usage at Mummert's car wash.

Mummert appeared at the September 24 Commission meeting, and asked that the City remove the restrictions entirely for car washes. In addition, Jim Collins, the owner and operator of North Santa Fe Auto & Detail, also asked for an exception to the restrictions, as the business was his main source of income. The city denied both requests.

4

The City Commissioners again addressed the water issue at the October 8 meeting. Gates noted that the City had no back-up water supply. The minutes record:

> City of Chanute is in Stage 2 Water Warning with no back up emergency water supply. In 1956 and 1961 1ow water dams were designed and constructed on the Neosho River to Impound water for drought conditions. How much water exists in this impoundment is unknown. Rock quarries and Santa Fe Lake are being tested for water quality and investigated as an emergency water supply, but there is no Infrastructure to move the water to the Water Plant. The city has also looked into building a dam for emergency water supply and investigated drilling wells and using effluent from the Waste Water Plant.
>
> Surveys will need to be conducted on the river and on the rock quarries to see how much water we have impounded. Surveying and engineering will need to be completed if the City decides to move forward on emergency water supply and a new water supply take.
>
> Surveying above the dams on the Neosho River, Santa Fe Lake, and area rock quarries will cost an estimated $10,000. Infrastructure costs needed to pump water from the rock quarries to the water plant are estimated around $2,000,000. Estimates to build a new lake are from $2 to $4,000,000. Permitting will take up to 3 years on the dam.
>
> General discussion was led by Utility Director Larry Gates. He provided handouts to the Commission for review. The cost for the survey would be paid out of the Water Utility Fund. The survey would tell the City how water could be available at the three damns [sic], area rock quarries and Santa Fe Lake. Samples to test the quality of water have already been taken from the quarries and Santa Fe Lake and should results should be received any day.

The Commission approved the survey. At a meeting on December 27, 2012, the Commission asked staff to find out about state or federal assistance for developing Santa Fe Lake as a future source of water.

On December 21, 2012, the Governor wrote to Kansas public water suppliers to report that "[t]he persistent drought in which we find ourselves is not expected to end in

5

the near term." He encouraged public water suppliers to investigate and quantify their resources, and to continue with conservation efforts. He wrote:

> We have all seen news reports of large cities and small towns across the nation that have run out, or nearly run out of water due to lack of planning and monitoring. Let's make sure that others look to Kansas and our public water suppliers as an example of how to deal with drought rather than what happens when you don't prepare.

According to a February 14, 2013 Drought Update, "[t]he latest Drought Monitor continues to indicate drought or worse for the entire state of Kansas, and that these conditions were expected to persist at least through April of 2013. The USGS indicated low or no flow conditions at many streams in Kansas, and 212 public water suppliers had instituted water conservation policies.

According to the plaintiff's motion, the car wash was historically the seventh largest water user in Chanute. After the restrictions were imposed, the plaintiff's water consumption has dropped 65%, and is now "one of the bottom water users in the Top 39."

At the hearing, the plaintiff introduced evidence showing that other municipalities in the area imposed restrictions on car washes for a few weeks only, and have not imposed such restrictions at the present time.

*Conclusions of Law*

Injunctive relief requires a showing that the movant has a substantial likelihood of success on the merits and faces irreparable harm absent the relief, harm which is greater than the damage of the relief to the opposing party, and that the preliminary injunction is

6

consistent with the public interest. *Beltronics USA v. Midwest Inventory Distrib.*, 562 F.3d 1067, 1070 (10th Cir. 2009).

The City argues that the plaintiff's claim for injunctive relief seeks a mandatory injunction, one of the historically-disfavored forms of injunction, and thus is subject to the additional need for close scrutiny to ensure that the movant presents a strong showing of the need for an injunction. The City cites *Schrier v. University of Colorado*, 427 F.3d 1253, 1260 (10th Cir. 2005) for the proposition that a requested injunction, which may appear to be simply prohibitory, may actually be mandatory in nature. The City argues that the injunction sought by the car wash is mandatory because the City would have to act in a particular way (by lifting the water restriction) – and would require continuing supervision (as it may require deciding whether the restriction should be raised for just plaintiff or other businesses as well, and may require additional modifications if the drought continues). The plaintiff argues that the requested injunction is purely prohibitory, as it would simply require the City to vacate those portions of the restrictions applicable to car washes.

"[D]etermining whether an injunction is mandatory as opposed to prohibitory can be vexing." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1006 (Seymour, J., dissenting in part), *aff'd* 546 U.S. 418 (2006). "In many instances, this distinction [between mandatory and prohibitory] is more semantical than substantive. For to order a party to refrain from performing a given act is to limit his ability to perform any alternative act; similarly, an order to perform in a particular manner may be tantamount

7

to a proscription against performing in any other." *Id.* (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025–26 (2d Cir.1985), *overruled on other grounds by O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 n. 2 (1987)). An injunction is mandatory "if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result ... place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction." *Schrier*, 427 F.3d at 1261 (quoting *O Centro*, 389 F.3d at 1106 (quoting *SCFC ILC, Inc. v. Visa USA*, 936 F.2d 1096, 1099 (10th Cir. 1991))).

The court finds that the requested injunctive relief is mandatory in nature. The requested relief would require the lifting of water conservation restrictions on the plaintiff,, but also force the City to reevaluate its Water Restrictions in general. Such an injunction would require further supervision of Chanute's water system as other users may seek modifications, and as the drought continues or becomes worse.

However, the court concludes that this characterization of the requested injunction is not dispositive. That is, even if the plaintiff's claim is viewed under the typical likelihood-of-success standard, the plaintiff has failed to demonstrate the need for injunctive relief.

*Likelihood of Success*

A governmental regulation which does not affect an underlying fundamental right, such as the water restriction here in dispute, will be upheld if it is "rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

8

Faced with a challenge to such a regulation, the court must determine whether the regulation was enacted for a legitimate public purpose, and to determine if the regulation is rationally related to that purpose. *Dias v. City and County of Denver*, 567 F.3d 1169, 1183 (10th Cir. 2009). Rational basis scrutiny imposes a "strong presumption of validity," and requires courts to avoid judging the "wisdom, fairness, or logic" of the defendants' decision. *See FCC v. Beach Comm'ns.*, 508 U.S. 307, 313-14 (1993). "Where ... there are plausible reasons for [the defendant's] action, '[the court's] inquiry is at an end.'" *United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 179. Under the this standard, the City's restrictions will be upheld so long as they have "some footing in the realities of the subject." *Heller v. Doe*, 509 U.S. 312, 321 (1993)

There can be no doubt that the preservation of water supplies during a time of drought is a legitimate public purpose. *See Lockary v. Kayfetz*, 917 F.2d 1150, 1155 (9th Cir. 1990) (stating that a ban on new water hookups could be "rationally related to a legitimate state interest in controlling a water shortage, but determining that the defendant had failed to prove the existence of the shortage). Nor are there any substantial grounds for doubting that the State of Kansas in general, and the City of Chanute in particular, have been subjected to a substantial drought and face the need for substantial water conservation.

The issue therefore becomes whether the water restrictions imposed by the City in 2012 are unrelated to the need for water conservation. The core of plaintiff's present argument follows that advanced by Mummert at the August 27, 2012 Commission meeting, that it is unfair that *his* business was singled out. Thus, the plaintiff's brief contends that,

9

while it was the seventh largest user of water in Chanute, "none of the historic water consumers above it were specifically targeted." (Dkt. 5, at 2). It continues by asserting that it "is the only business in the state that has had its hours curtailed." (*Id*. 2-3). It asserts that "the car wash is the only business specifically targeted." (*Id*. at 4). The memorandum does not provide any factual support for these factual assertions.

The records introduced by the City, on the other hand, establish that the City did not single the plaintiff out from other car washes. That evidence shows that the City restricted the hours of all car washes in the city. At the September 24, 2012 City Commission meeting, the city again heard from Mummert, the owner of the plaintiff, who "expressed concerns regarding city water restrictions." But the Commission also explicitly considered, and rejected, the written request for any exemption by the owner of another car wash, Sante Fe Auto & Detail.

Further, while car washes in the city have been subjected to restricted hours, other businesses have not escaped the effect of water conservation. Golf courses and swimming pools have been subjected to specific restrictions designed to eliminate their use of water during peak hours. More generally, all persons and businesses in the city have been subjected to limits on when watering may be done. The city also generally prohibits wasting of water and requires water leaks to be repaired within a day of their detection.

The City has provided substantial evidence that its restrictions were adopted in the face of a chronic and severe drought. The City adopted water restrictions at the suggestion of the State of Kansas which include restrictions on water usage in general, and specific

restrictions on non-essential water usage. The plaintiff was not singled out as such, but was grouped by the City together with other non-essential users, including other car washes. As one City Commissioner observed, car washes are distinct because their water usage is not incidental to their business. Rather, car washes are by their nature "in the business of selling water." That the City may rationally distinguish among types of water use was conceded by the owner of the plaintiff at the August 27, 2012 Commission meeting, where he agreed that "bathing, drinking, and cooking is whole lot more essential than washing cars."

The plaintiff has supplied no authority striking down water restrictions under similar circumstances. The City, on the other hand, has cited *Express Carwash of Charlottesville v. City of Charlottesville*, 320 F.Supp.2d 466, 473 (W.D. Va. 2004). That case presents the same factual background as the present, with the Commonwealth of Virginia experiencing a severe drought and the Governor declaring a state of emergency. The sole distinction is that the defendant City of Charlottesville responded with a series of water conservation measures which were far more severe than those adopted by Chanute. For example, Charlottesville did not restrict the hours of operations of car washes, it completely banned all "[w]ashing of automobiles, trucks, trailers, or any other type of mobile equipment, except in licensed commercial vehicle wash facilities." 320 F.Supp.2d at 467.

The court rejected the car wash's Equal Protection claim. It first observed that "[t]here is no doubt that imposing water restrictions during a severe drought is a legitimate government purpose, a conclusion that the plaintiff does not challenge." *Id.* at 473. With

11

respect to the means adopted to conserve water, the court held that "the City certainly could have believed that prohibiting [car washing] was rationally related to the conservation of water. It is rational for a community to decide that precious water resources should not be diverted to the washing of cars during a declared state of emergency." *Id.*

Finally, the court also rejected the contention, made as well here by plaintiff, that it was subjected to heavier restriction than other businesses.

> It is true that a party can bring an equal protection claim by alleging that it has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. However, the plaintiff has not claimed that it has been treated differently from other businesses or persons *that wash cars*. There has been no allegation that other carwash facilities were permitted to operate or that individual citizens were allowed to wash their cars while the plaintiff was nevertheless restricted (or that either were granted exemptions from the ordinance while the plaintiff's request was denied). Therefore, the plaintiff has failed to state a valid equal protection claim.

*Id.* (quotations and citations omitted; emphasis in *Express Carwash*).

In adopting its conservation measures, the City could legitimately consider the relative necessity of various types of water use. The court finds *Express Carwash* persuasive, and holds that the same result applies here. The City could rationally focus on businesses which use large amounts of water for non-essential purposes.

*Irreparable Injury*

There is little evidence to support the existence of an irreparable injury. The only injury cited in plaintiff's motion is the contention that its business was off 75% percent. At the hearing, Mummert testified that his current revenue is approximately 50% of what it was before the water restrictions.

As Mummert testified, he continues to pay taxes and insurance at a constant rate. On the other hand, as a coin-operated self-service and automatic car wash, the plaintiff likely has few employees and its remaining expenses are limited and variable. The plaintiff is thus better suited than most to enduring a protracted period of reduced revenue. The plaintiff has offered no evidence of its total expenses or profits, or otherwise shown that it is likely to be driven out of business soon because of the water restrictions. To the contrary, a negative inference may be drawn from the fact that the plaintiff has remained in business for half a year with the water restrictions in place.

Accordingly, the plaintiff has provided evidence demonstrating at most that it has lost revenue due to the water restrictions. For purposes of obtaining an injunction, irreparable injury does not exist if the movant's injury may "be adequately atoned for in money." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir.2001). *See also Tri-State Generation v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir.1986) (injury is generally not irreparable if monetary damages are available).

The plaintiff argues in its Reply that irreparable injury arises from the fact of the constitutional violation itself. And the Tenth Circuit has generally recognized that

13

irreparable injury may be presumed when a constitutional right is involved. *See Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (citing 11A Wright, Miller & Kane, FED. PRAC. & PROC. § 2948.1 (2d ed. 1995)). But both *Kikamura* itself and the cases cited in underlying treatise involve *personal* assertions of constitutional rights, grounded on the First Amendment, Fourth Amendment, or Equal Protection claims which are in turn based on race or other suspect classification. None of the cited authorities indicate that a business, suing on Equal Protection grounds that are not premised on a suspect classification or violation of a fundamental right, is entitled to the presumption of irreparable harm.

Finally, the plaintiff presents a general argument that the restrictions serve to generally diminish the value of the business in general. Courts recognize injury to reputation or the loss of business goodwill as grounds for finding irreparable injury "when the failure to grant preliminary relief creates *the possibility of permanent loss of customers to a competitor.*" *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) (emphasis added). Here, the City's water restrictions apply to all car washes, and so there is no basis for inferring a general loss of market share to any competitor. Nor has the plaintiff shown any particular injury to the reputation of Eighth Street Car Wash.

The court finds that the plaintiff has failed to establish the existence of irreparable injury in the absence of injunctive relief.

*Balance of Equities and Public Interest*

As the court noted at the hearing, both the City and the plaintiff have acted in good faith in attempting to preserve their respective interests. When comparing the interests of the car wash and the City for purposes of the present motion, the balance does not support injunctive relief. Denying the injunction will still leave the plaintiff the opportunity to seek monetary damages for its lost revenue. Granting the injunction, on the other hand, could force the City to fundamentally rework its entire system of conservation, a system which the evidence at the hearing indicates has been successful in reaching its conservation goals. Aside from its own economic self-interest, the only public interest which would be served by granting an injunction is that the citizens of Chanute can no longer get their cars washed. (Dkt. 5, at 4). Weighing all the circumstances of the case, the court finds that the balance of equities between the parties, as well as the general public interest, do not support the issuance of an injunction.

IT IS ACCORDINGLY ORDERED this 7th day of March, 2013, that the plaintiff's Motion for Preliminary Injunction (Dkt. 4 ) is hereby denied.

<pre>
                                        s/ J. Thomas Marten
                                        J. THOMAS MARTEN, JUDGE
</pre>